**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Margaux Hylla,

Plaintiff,

v.

Independent School District No. 821 (Menahga Public Schools); and Jason Kjos, in his individual capacity,

Defendants.

Case No. 26-CV-4951

**COMPLAINT**
**(JURY TRIAL DEMANDED)**

## INTRODUCTION

1. Menahga is a small town in northern Minnesota. There are three Christian churches within Menahga's public school district, and many (but not all) of the District's students belong to them.

2. But Menahga's schools are public schools. They belong to every student and family in the community, whatever their faith.

3. Margaux Hylla understood that. The superintendent of Menahga Public Schools (Jason Kjos) did not.

4. In July 2022, Hylla became the principal of Menahga's elementary school.

5. Within months, Kjos (Hylla's supervisor) urged Hylla to use the Christian Bible for student discipline. Specifically, he encouraged Hylla to use biblical teachings to help children and their parents understand and correct misbehavior.

6. Kjos also asked Hylla whether she was Christian.

7. She told him she was not.

8. She also told him that she refused to use the Bible to discipline other people's children.

9. Kjos didn't take no for an answer. He continued encouraging Hylla to use the Bible to address disciplinary issues. And every time Kjos raised it, Hylla refused – and she reminded him that Menahga is a public school. She even escalated her concerns to the school board.

10. But Kjos didn't stop. He told Hylla that she needed to earn the local church community's trust. And he encouraged her to stop wearing long earrings and otherwise adjust her appearance to conform to the churches' gender expectations.

11. Kjos's religious fixation came to a head during preparations for the Spring concert. The concert included an inoffensive and nationally popular song

that was written by a member of the LGBT community. When church members learned about the songwriter's sexuality, they demanded that Hylla remove it from the concert program. Hylla refused. But she offered a compromise by allowing families to opt their students out of singing the song.

12. Kjos stepped in and overruled Hylla's decision – catering to the church community by removing the song based solely on religious objections to the songwriter's identity.

13. Hylla opposed Kjos's decision, on grounds that it was unlawful for a public school to elevate one religion's preferences over others. Hylla emphasized that removing the song based on Christianity-based objections would require removing Christmas songs based on non-Christianity-based objections. The District could not pick and choose which religions it preferred.

14. But Kjos held firm because, in his words, he wanted to "make the community happy."

15. Despite all the religious tension, Hylla excelled as a principal. Even as Kjos grew frustrated with her religious neutrality, he praised her "clear vision" and leadership, concluding: "I honestly couldn't ask for a better colleague."

16. Even as he recognized Hylla's strong performance, Kjos viewed her religious neutrality as a threat to her employment.

17. Kjos told one of Hylla's colleagues that Hylla struggled in the role because she was a "non-believer." Kjos later told the colleague that her non-belief would cost Hylla her job.

18. Kjos was right. After the dust-up over the Spring concert, church members grew frustrated with Hylla's commitment to religious neutrality. They organized to generate and submit complaints about Hylla and to advocate for her termination.

19. Kjos fielded the church members' coordinated complaints without discussing them with Hylla. After compiling a critical mass of complaints, Kjos recommended that the school board not renew Hylla's contract.

20. The board did as Kjos asked and non-renewed Hylla – resulting in her termination from the District.

21. Hylla did not share the local majority's religion. And she opposed Kjos's unconstitutional efforts to impose religion on the District's students. The District and Kjos fired her for it. In doing so, they violated the First and Fourteenth Amendments to the United States Constitution, the Minnesota Human Rights Act, and the Minnesota Whistleblower Act.

22. Hylla brings this suit to hold the District accountable.

## JURISDICTION & VENUE

23. The Court has original jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343(a) because Hylla pursues claims under federal law, including 42 U.S.C. § 1983.

24. The Court has supplemental jurisdiction over Hylla's claims under the Minnesota Human Rights Act and the Minnesota Whistleblower Act under 28 U.S.C. § 1367(a), because those claims arise from the same nucleus of operative facts as her federal claims and form part of the same case or controversy.

25. The Court has personal jurisdiction over Defendants because the District is a Minnesota public school district and political subdivision of the State of Minnesota, because Kjos is a citizen of Minnesota, and because the conduct described in this Complaint occurred in Minnesota.

26. Venue is proper in this District under 28 U.S.C. § 1391(b)(1)–(2) because Defendants reside in Minnesota and the events giving rise to Hylla's claims occurred in Minnesota.

**PARTIES**

27. Plaintiff Margaux Hylla is a citizen of Minnesota. She resides in Park Rapids, Minnesota. From July 11, 2022, through June 30, 2023, Hylla worked for the District as the principal of its elementary school.

28. Hylla was the District's "employee" within the meaning of Minn. Stat. § 363A.03, subd. 15 and Minn. Stat. § 181.931, subd. 2.

29. Defendant Independent School District No. 821 ("the District") is the Menahga Public School District. It is a public school district organized under Minnesota law and a political subdivision of the State of Minnesota. Its district office is located at 216 Aspen Avenue SE, Menahga, Minnesota 56464.

30. The District was Hylla's "employer" within the meaning of Minn. Stat. § 363A.03, subd. 16 and Minn. Stat. § 181.931, subd. 3.

31. The District is governed by its school board. During the 2022–2023 school year, Andrea Haverinen was the chair of the school board.

32. Defendant Jason Kjos was, at all times relevant to this Complaint, the District's superintendent and Hylla's direct supervisor. Kjos is a citizen of Minnesota and, upon information and belief, resides in Menahga, Minnesota.

33. At all relevant times, Kjos acted under color of state law and within the scope of his employment with the District.

## FACTUAL ALLEGATIONS

### *Menahga's public schools serve a community with a large Christian presence.*

34. The District operates public schools serving Menahga, Minnesota, and the surrounding area.

35. Three large Christian churches are located within the District's boundaries. A significant number of the District's students are members of those churches.

36. At least one of the local churches teaches strict gender roles and requires women to dress modestly. The church prohibits women from wearing bold jewelry like "long and dangly" earrings.

37. As a public school district, the U.S. and Minnesota constitutions require the District to remain neutral in matters of religion.

38. Under the U.S. Constitution, a public school district "may not coerce anyone to support or participate in religion or its exercise." *Lee v. Weisman*, 505 U.S. 577, 587 (1992). Nor may a public school district use the school function "to advance religious views that may conflict with the private beliefs of the student and his or her family." *Edwards v. Aguillard*, 482 U.S. 578, 584 (1987).

39. Under the Minnesota Constitution, a public school district may not give "any preference … to any religious establishment or mode of worship." Minn. Const. art. I, § 16. Nor may a public school district promote the "creeds or tenets of any particular Chirstian or other religious sect." Minn. Const. art. XIII, § 2.

***Hylla is a highly qualified educator who ascribes to non-Christian religious beliefs.***

40. Hylla is a Native American woman. She holds traditional Native spiritual beliefs.

41. Hylla is not Christian. She does not believe in the Christian God, and she does not look to the Christian Bible for religious guidance.

42. Hylla has a bachelor's degree in Elementary Education from St. Cloud State University.

43. She has a master's of education degree in Leadership and Administration from Concordia University, St. Paul.

44. And she has an educational specialist degree – an advanced postgraduate degree specific to education.

45. Hylla's graduate coursework included the study of culturally responsive teaching and learning.

46. Hylla is a licensed Minnesota teacher and holds a K–12 principal license.

47. Hylla's education gave her academic and practical experience tailoring educational approaches to students' customs, life experiences, cultural backgrounds, and perspectives.

48. But her education also made her recognize that cultural responsiveness does not trump a public school's constitutional obligations.

***Hylla's role in the District.***

49. On July 11, 2022, Hylla began working for the District as the principal of its elementary school.

50. As principal, Hylla's responsibilities included student discipline, individualized education programs (IEPs), and supervision of elementary school staff.

51. During the 2022-23 school year, Hylla was a probationary employee with an annual contract subject to Board renewal.

52. Although Hylla's contract was subject to Board renewal, the Board is prohibited from making renewal decisions based on her membership in a protected class or her protected conduct.

***Kjos pressed Hylla to bring the Bible into student discipline.***

53. On November 15, 2022, Hylla asked Kjos for help with a difficult behavioral-disciplinary matter.

54. Kjos asked Hylla whether the student belonged to the local church.

55. Then, Kjos instructed Hylla to schedule a disciplinary meeting with the student's parents and use biblical teaching to guide the student's behavior.

56. Hylla refused. She reminded Kjos that they worked for a public school.

57. On November 22, 2022, Hylla again consulted Kjos about a behavioral-disciplinary matter.

58. Again, Kjos pressed Hylla to meet with the student's parents and use the Bible to correct the student's behavior – specifically, by emphasizing that the Bible doesn't condone the behavior.

59. Again, Hylla refused.

60. Kjos then asked Hylla whether she was Christian.

61. Hylla told him that she was not.

62. On December 19, 2022, Hylla once again met with Kjos about a behavioral-disciplinary matter. Rather than help Hylla address the issue, Kjos quizzed her about the Bible – asking her what it taught about the issue.

63. Kjos tried to justify incorporating religion into student discipline by implying that it was the only way to demonstrate "an understanding of her audience."

***Hylla reported Kjos's conduct to the school board and others.***

64. On December 20, 2022 – the day after Kjos quizzed her about the Bible – Hylla wrote a letter to the chair of the school board, Andrea Haverinen, about Kjos's conduct.

65. Hylla reported that, in three conversations about student discipline, Kjos "asked me if I have or recommended that I should bring the Bible into conversations about specific behaviors and discipline with both students and families."

66. She reported that she told Kjos "all 3 times that I will not do so and that Menahga is a public school," and that Kjos "also asked me if I am a 'Christian.' I have responded that I am not."

67. Hylla reported that she felt "isolated and concerned over these conversations," and she asked to meet with Haverinen to discuss her concerns.

68. Hylla mailed the letter to Haverinen because the District monitors employee emails and Hylla didn't want Kjos to learn of her report until the board responded.

69. After nearly a month without a response, on January 17, 2023, Hylla briefly restated her concerns to the Board during a Board meeting.

70. The Board chose not to take up the issue and encouraged Hylla to schedule a separate meeting. But when Hylla tried to schedule a meeting, the Board ignored her.

71. Unsuccessful in her efforts to report to the school board, Hylla reported Kjos to the District's Dean of Students, Michelle Koch.

72. Specifically, Hylla reported that Kjos instructed her to incorporate religion into student discipline and that he questioned her about Christianity and the Bible because she told him she wasn't Christian.

***Hylla excelled, and Kjos said so.***

73. On February 14, 2023, Kjos gave Hylla a formal performance evaluation.

74. Kjos praised Hylla's performance, remarking on her "clear vision" and stellar leadership: "Margaux is recognized as a leader at MPS … her professional development enhances the functioning of the district. Margaux's staff follow her lead."

75. Kjos concluded: "I honestly couldn't ask for a better colleague."

***Kjos kept pressing Hylla to incorporate religion into school operations.***

76. On February 27, 2023, Kjos urged Hylla to use the Bible in student discipline for the fourth time.

77. During the conversation, Kjos told Hylla that she needed to gain the local church community's trust. Kjos emphasized that deference to the church community was instrumental to keeping her job. Kjos even told Hylla that his own job depended on his deference to the church community.

78. Kjos also told Hylla about the church community's complaints about her appearance. He suggested that Hylla stop wearing makeup, earrings, and other jewelry because they conflicted with the church's views of women.

***Hylla refused to let church objections dictate the Spring concert.***

79. In Spring 2023, the elementary school prepared for its Spring choir concert.

80. The program included the award-winning song "This is Me," from the film "The Greatest Showman."

81. The song promotes self-confidence and resiliency, with lyrics about everyone deserving love and acceptance.

82. Church members objected to the song because it was written by a member of the LGBT community.

83. Church members demanded that Hylla remove the song from the program.

84. Hylla respectfully declined. She proposed that parents who objected could opt their children out from performing the song. But she would not wholly remove the song simply because it conflicted with the churches' religious beliefs.

85. The church members took their complaints to Kjos.

86. Kjos ordered Hylla to remove the song because removing it would "make the community happy."

87. Hylla refused. She reminded him that, as a public school, Menahga serves the entire community – not just the religious community.

88. Kjos overruled Hylla and removed the song.

89. After Hylla opposed Kjos's decision to remove the song, Kjos began treating her differently. Where he had once regularly praised her performance and spoke of their excellent working relationship, he largely stopped speaking with her unless he absolutely had to.

***Church members organized to oust Hylla, and complaints followed.***

90. After the concert dispute, prominent church members created an online group to solicit complaints about Hylla. Their goal was to persuade the Board not to renew Hylla's contract.

91. Several District employees (who were also members of the church community) participated in the online group.

92. Church members in the online group encouraged others to contact the Board to tell them that they disapproved of Hylla.

93. And Kjos received "daily" complaints from the group beginning in mid-April 2023 – that is, beginning after the concert dispute. Many of the complaints objected to Hylla's supposed "combativeness" with the church community.

94. In May, Kjos told Hylla about the onslaught of complaints. Before then, Hylla had not heard any community concerns about her performance or conduct.

***Kjos openly deferred to the wishes of the church community.***

95. Kjos told one of Hylla's colleagues that Hylla was struggling because she was a "non-believer" – in other words, because she did not believe in a Christian God.

96. After Hylla publicly acknowledged that she did not believe in God, Kjos told the same colleague that Hylla's public acknowledgment would cost her her job.

97. Kjos's deference to the local churches extended to hiring.

98. In May 2023, the District was filling an elementary teaching position. Kjos, Hylla, and three teachers sat on the hiring committee.

99. Kjos had numerous conversations with one candidate outside the formal selection process. He told Hylla that the candidate was an excellent fit for the position in part because she planned to marry into the local church.

100. Kjos insisted on participating in the candidate's interview, which was unusual for hiring a basic teaching position. During the interview, Kjos remarked that the candidate would be happy to live in Menahga long-term because of her connection to the local church.

101. The committee had planned to recommend a different candidate. But Kjos pressed Hylla to select the church-affiliated candidate, emphasizing the

need to earn the church community's trust. Hylla relented, and the District hired the church-affiliated candidate.

102. Kjos also deferred to the religious community during public meetings.

103. At a May 2, 2023 community "listening session," Kjos welcomed a proposal to have church "delegates" vet the District's curriculum and library materials. Even further, Kjos announced that he had already persuaded the school board to "involve community members in the process of vetting curriculum." And Kjos shared a "vision" for the District that included "maintaining local morals/values."

104. At the same meeting, a community member asked: "How do we fund a private school with public money?" Kjos responded: "I wish I had the answer."

***Hylla's staff overwhelmingly supported her.***

105. Between May 3 and May 12, 2023, District staff completed an end-of-year survey about Hylla's performance.

106. The results were largely positive. Hylla averaged above 3.4 out of 5 in 14 of the survey's 15 categories, with high marks in categories related to leadership and treatment of others in the workplace.

107. Staff comments were glowing. One staff member wrote: "She has been an amazing leader that stepped in to 9+ grade levels and so many staff and did it with such confidence." Another wrote: "I can't believe how lucky we are to have been blessed with Margaux!" Another: "Thank you for joining our team. We truly are lucky to have you!"

108. On May 10, 2023, Dean of Students Koch wrote Hylla a letter of recommendation. Koch wrote that Hylla "is an excellent communicator, both orally and through the written word," that she "has exceptionally strong professional relationships with our current teaching teams and with the families in our district," and that she "is a person of high integrity, a confident leader who puts the needs of our students first."

109. Hylla's performance also earned her praise from the head of the statewide principals' association.

***Kjos recommended nonrenewal, and the Board rubber-stamped his recommendation.***

110. On May 10, Kjos met with Hylla for an end-of-year evaluation.

111. Kjos told Hylla that he would recommend that the Board not renew her contract. Kjos told Hylla that his recommendation was due to "stakeholder complaints."

112. Kjos proceeded to recommend to the Board that it not renew Hylla's contract.

113. On May 15, 2023, the Board voted not to renew Hylla's contract.

114. The Board did not independently evaluate Kjos's recommendation. One Board member acknowledged that they did not question Kjos's recommendation. Another stated that they were comfortable simply accepting the information Kjos provided about Hylla.

115. By voting not to renew Hylla's contract on Kjos's recommendation, without questioning it, the Board approved both Kjos's recommendation and the basis for it.

116. The Board was also aware of the church community's campaign against Hylla. Community members and staff took their complaints about Hylla directly to the Board.

117. Hylla's employment with the District ended on June 30, 2023.

***Hylla exhausted her administrative remedies and established probable cause of discrimination.***

118. On September 1, 2023, Hylla timely filed a charge of discrimination with the Minnesota Department of Human Rights ("MDHR"), alleging religious discrimination and reprisal. MDHR cross-filed the charge with the U.S.

Equal Employment Opportunity Commission ("EEOC") (EEOC Charge No. 26E202300299).

119. On March 16, 2026, the MDHR found probable cause to believe that the District discriminated against Hylla because of her religion. The MDHR found that "there is direct evidence of discriminatory intent" and that Kjos's "statements reveal that Respondent's discriminatory intent was a motivating factor in its decision not to renew [Hylla's] contract."

**COUNT 1**
**FREE EXERCISE AND ESTABLISHMENT CLAUSES**
**42 U.S.C. § 1983; U.S. Const. amends. I, XIV**
**(Against Kjos and the District)**

120. All paragraphs of this Complaint are incorporated here.

121. Section 1983 provides a cause of action against any person who, under color of state law, deprives another of "any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983.

122. The First Amendment, applicable to the States through the Fourteenth Amendment, provides that the government "shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I.

123. A government entity may not condition public employment on a profession of religious belief. *Torcaso v. Watkins*, 367 U.S. 488, 495–96 (1961) ("The fact, … that a person is not compelled to hold public office cannot possible be an excuse for barring him from office by state-imposed criteria forbidden by the Constitution. … [W]hether or not an abstract right to public employment exists, Congress could not pass a law providing that no federal employee shall attend Mass or take any active part in missionary work." (quotation omitted)).

124. Nor may a government entity "regulat[e], prohibit[], or reward[] religious beliefs as such." *McDaniel v. Paty*, 435 U.S. 618, 626 (1978).

125. Nor may a government entity "coerce anyone to support or participate in religion or its exercise." *Lee v. Weisman*, 505 U.S. 577, 587 (1992).

126. Kjos, acting under color of state law, violated Hylla's rights under the Free Exercise and Establishment Clauses by:

a. Pressuring Hylla to incorporate Christianity into her official duties and to defer to local churches' religious beliefs as a condition of keeping her job.

b. Probing Hylla's religious beliefs and observing that her non-belief would ultimately cost her her job.

c. Pressuring Hylla to conform her appearance to a local church's teachings about women.

d. Causing Hylla's termination (by recommending nonrenewal) because Hylla refused to support or participate in Christianity and acknowledged that she did not believe in God.

127. The District is liable for the constitutional violations because the school board exercised its authority to bring about the unconstitutional action (terminating Hylla because of her religion), and the school board is "the decisionmaker [that] possesses final authority to establish municipal policy with respect to the action ordered." *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 480–81 (1986) ("No one has ever doubted … that a municipality may be liable under § 1983 for a single decision by its constituted legislative body … because even a single decision by such a body unquestionably constitutes an act of official government policy."); *see also* Minn. Stat. § 123B.02, subd. 1 ("The board must have the general charge of the business of the district.");

*id.* § 122a.40, subd. 5(a) ("[A]ny annual contract with any teacher may or may not be renewed as the school board shall see fit.").

128. The fact that the school board only acted on Kjos's recommendation does not save it from municipal liability. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (plurality opinion) ("If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final.").

129. Kjos is not entitled to qualified immunity. For decades before 2022, it has been clearly established that the government may not condition public employment on religious belief. *Torcaso*, 367 U.S. at 495–96; *see also Marrero-Méndez v. Calixto-Rodríguez*, 830 F.3d 38, 47-48 (1st Cir. 2016) (surveying national case law and concluding that "punishing [an employee] for non-conformance" with an employer's religious preferences was a clearly established violation of law).

130. As a direct result of Defendants' violations, Hylla has suffered and will continue to suffer damages, including lost wages and benefits, lost earning capacity, emotional distress, mental anguish, embarrassment, and humiliation.

131. Defendants are liable to Hylla for compensatory damages and reasonable attorney fees and costs.

132. Additionally, because Kjos persisted with his conditioning Hylla's employment on religious belief – despite Hylla's opposition – he acted with malice or reckless indifference to Hylla's rights and is liable for punitive damages.

**COUNT 2**
**EQUAL PROTECTION**
**42 U.S.C. § 1983; U.S. Const. amend. XIV**
**(Against Kjos and the District)**

133. All paragraphs of this Complaint are incorporated here.

134. The Equal Protection Clause of the Fourteenth Amendment prohibits a State from "deny[ing] to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

135. Intentional discrimination in public employment because of religion violates the Equal Protection Clause.

136. Kjos, acting under color of state law, intentionally discriminated against Hylla because of her religion by recommending her nonrenewal because she was a "non-believer" who would not conform or defer to the local churches' faith.

137. The District is liable for the constitutional violation because the school board exercised its authority to bring about the discrimination (terminating Hylla because of her religion), and the school board is "the decisionmaker [that] possesses final authority to establish municipal policy with respect to the action ordered." *See Pembaur*, 475 U.S. at 480–81; *see also* Minn. Stat. § 123B.02, subd. 1; *id.* § 122a.40, subd. 5(a).

138. The fact that the school board only acted on Kjos's recommendation does not save it from municipal liability. *Praprotnik*, 485 U.S. at 127.

139. Kjos is not entitled to qualified immunity. It has long been clearly established that a public official may not take adverse employment action against an employee because of her religion. *See Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 605 (2008) ("[O]ur cases make clear that the Equal Protection Clause is implicated when the government makes class-based decisions in the employment context, treating distinct groups of individuals categorically differently.").

140. As a direct result of Defendants' violations, Hylla has suffered and will continue to suffer damages, including lost wages and benefits, lost earning

capacity, emotional distress, mental anguish, embarrassment, and humiliation.

141. Defendants are liable to Hylla for compensatory damages and reasonable attorney fees and costs.

142. Additionally, because Kjos persisted in discriminating against Hylla – despite Hylla's opposition – he acted with malice or reckless indifference to Hylla's rights and is liable for punitive damages.

**COUNT 3**
**RELIGIOUS DISCRIMINATION**
**Minnesota Human Rights Act, Minn. Stat. § 363A.08, subd. 2**
**(Against the District)**

143. All paragraphs of this Complaint are incorporated here.

144. The MHRA provides that, "[e]xcept when based on a bona fide occupational qualification, it is an unfair employment practice for an employer, because of … religion … to: (1) refuse to hire … a person seeking employment; (2) discharge an employee; or (3) discriminate against a person with respect to hiring, tenure, compensation, terms, upgrading, conditions, facilities, or privileges of employment." Minn. Stat. § 363A.08, subd. 2.

145. The MHRA "shall be construed liberally" to accomplish its purposes. Minn. Stat. § 363A.04.

146. Direct evidence establishes that religion motivated the District's decision to terminate Hylla via nonrenewal. "Direct evidence is evidence of conduct or statements by the employer's decisionmakers sufficient to permit a fact-finder to infer that the discriminatory attitude was more likely than not a motivating factor in the employer's adverse employment decision." *Taylor v. LSI Corp. of Am.*, 781 N.W.2d 912, 917 (Minn. App. 2010). The following facts demonstrate a specific link between Hylla's religion (or lack thereof) and the District's actions:

a. Kjos – the decisionmaker who recommended Hylla's nonrenewal – told a colleague that Hylla was struggling because she was a "non-believer."

b. Kjos told the same colleague that Hylla's public acknowledgment that she did not believe in God would cost her her job.

c. Kjos repeatedly urged Hylla to bring the Bible into student discipline, asked whether she was Christian, and told her that she needed to earn the church community's trust to keep her job.

147. The Board adopted Kjos's recommendation to nonrenew Hylla without independent scrutiny, such that Kjos's discriminatory animus is imputed to

the District. *See Staub v. Proctor Hosp.*, 562 U.S. 411, 419–22 (2011) ("The employer is at fault because one of its agents committed an action based on discriminatory animus that was intended to cause, and did in fact cause, an adverse employment decision.").

148. The circumstances also establish that religion motivated the District's decision to terminate Hylla via nonrenewal:

a. Hylla is a member of a protected class.

b. Hylla was qualified for her position, based on her education and her demonstrated performance of the role throughout the 2022-23 school year.

c. Hylla suffered an adverse employment action when the District nonrenewed her contract, resulting in her termination.

d. Kjos's consistent pressure to incorporate religion and cater to the local churches' preferences, Kjos's history of catering to the local churches' preferences, the church community's organized campaign against Hylla, and the timing of Kjos's nonrenewal recommendation after the dust-up over the Spring Concert all give rise to an inference of discrimination.

149. It does not matter whether Kjos or the District personally ascribed to the religious beliefs on which it based its decision to nonrenew Hylla. An employer remains liable if it discriminates because its customers or constituents prefer it to do so. *See Prater v. Trs. of the Hamline Univ. of Minn.*, 693 F. Supp. 3d 1009, 1026-27 (D. Minn. 2023) ("[C]aselaw recognizes that an employer [unlawfully discriminates] against an employee if it acts on the preference of third parties such as customers or clients." (citing cases and EEOC guidance)).

150. As a direct result of the District's discrimination, Hylla has suffered and will continue to suffer damages, including lost wages and benefits, lost earning capacity, emotional distress, mental anguish, embarrassment, and humiliation.

151. The District is liable to Hylla for compensatory damages, including damages for mental anguish or suffering, in an amount up to three times her actual damages; punitive damages; a civil penalty; reasonable attorney fees and costs; and equitable relief.

**COUNT 4**
**REPRISAL**
**Minnesota Human Rights Act, Minn. Stat. § 363A.15**
**(Against Kjos and the District)**

152. All paragraphs of this Complaint are incorporated here.

153. The MHRA provides that "[i]t is an unfair discriminatory practice for any individual who participated in the alleged discrimination as a[n] … employer … to intentionally engage in any reprisal against any person because that person … opposed a practice forbidden under this chapter." Minn. Stat. § 363A.15. Reprisal includes "any form of intimidation, retaliation, or harassment." *Id.*

154. Hylla engaged in protected activity when she:

a. Refused, on at least four occasions, Kjos's instruction to use the Bible for student discipline – and told Kjos that Menahga is a public school, making it unlawful to incorporate Christianity into school matters.

b. Reported to the school board in writing that Kjos had pressured her to use the Bible for student discipline and asked whether she was Christian, making clear that his religious fixation was concerning.

c. Verbally reported to the school board that Kjos had pressured her to use the Bible for student discipline and asked whether she was Christian.

d. Reported to Dean of Students Koch about Kjos's emphasis on Christianity and his fixation on her non-Christian beliefs.

e. Objected to Kjos's decision to remove an inoffensive song from the spring concert simply because it conflicted with church members' religious beliefs.

155. Hylla suffered an adverse employment action when the District nonrenewed her contract, resulting in her termination.

156. Hylla's protected conduct caused her nonrenewal. A causal connection may be shown by "circumstances that justify an inference of a retaliatory motive." *Hubbard v. United Press Int'l, Inc.*, 330 N.W.2d 428, 445 (Minn. 1983). Here:

a. Kjos knew of Hylla's protected activity because Hylla directly and repeatedly engaged in her opposition during interactions with Kjos.

b. Hylla reported Kjos's conduct to the school board, in writing and in person. The school board ignored Hylla's report – functionally siding with Kjos in the matter.

c. Kjos's treatment of Hylla took a 180-degree turn immediately after she vehemently objected to his removal of the concert song – the culmination of months of tension over Hylla's refusal to let religious preference dictate school policy. Kjos went from praising Hylla's performance to largely refusing to speak with her.

d. Complaints about Hylla's "combativeness" with the church community – and Kjos's receptiveness to the complaints – began only after Hylla and Kjos's disagreements over religion spilled into the public with the spring concert.

e. Kjos told a colleague that Hylla's public acknowledgment of her non-belief (which Kjos only learned during conversations where Hylla opposed bringing Christianity into student discipline) would lead to her termination.

f. Kjos recommended nonrenewal within weeks of Hylla's opposition to the song's removal, and within months of her written report to the Board.

157. As a direct result of Kjos and the District's reprisal, Hylla has suffered and will continue to suffer damages, including lost wages and benefits, lost earning capacity, emotional distress, mental anguish, embarrassment, and humiliation.

158. Kjos and the District are liable to Hylla for compensatory damages, including damages for mental anguish or suffering, in an amount up to three times her actual damages; punitive damages; a civil penalty; reasonable attorney fees and costs; and equitable relief. Minn. Stat. § 363A.33, subds. 7–9.

**COUNT 5**
**MINNESOTA WHISTLEBLOWER ACT**
**Minn. Stat. § 181.932**
**(Against the District)**

159. All paragraphs of this Complaint are incorporated here.

160. The MWA provides that an employer "shall not discharge" or otherwise penalize an employee "regarding the employee's compensation, terms, conditions, location, or privileges of employment because:"

a. "the employee … in good faith, reports a violation, suspected violation, or planned violation of any federal or state law or common law or rule adopted pursuant to law to an employer"; or

b. "the employee refuses an employer's order to perform an action that the employee has an objective basis in fact to believe violates any state or federal law or rule or regulation adopted pursuant to law, and the employee informs the employer that the order is being refused for that reason."

Minn. Stat. § 181.932, subd. 1(1), (3).

161. An employee acts in "good faith" so long as her report is not knowingly false or made with reckless disregard of the truth. Minn. Stat. § 181.931, subd. 4; *see Friedlander v. Edwards Lifesciences, LLC*, 900 N.W.2d 162, 165–66 (Minn. 2017).

162. Hylla engaged in protected conduct under the MWA by:

a. Refusing Kjos's orders to rely on the Bible for student discipline, and telling Kjos that she refused because Menahga is a public school.

b. Reporting in good faith, in writing and verbally, to the school board that Kjos was pressuring her to use the Bible for student discipline at a public school.

c. Refusing Kjos's order to remove a song from a public school concert because of church members' religious objections, and telling Kjos that she refused because the District had to maintain religious neutrality – requiring Kjos to overrule Hylla's refusal and remove the song on his own authority.

163. Hylla suffered an adverse employment action when the District nonrenewed her contract, resulting in her termination.

164. Hylla's protected conduct caused the District's decision. A causal connection may be shown by "circumstances that justify an inference of a retaliatory motive." *Hubbard*, 330 N.W.2d at 445. Here:

a. Kjos knew of Hylla's protected activity because Hylla directly and repeatedly refused Kjos's unlawful orders during personal interactions with Kjos.

b. Kjos told Hylla that deferring to the church community (i.e. abiding unlawful orders to incorporate religion in an effort to please the

church community) was instrumental to keeping her job. When Hylla refused to violate the Constitution to please the church community, Kjos made good on his statement – recommending nonrenewal.

c. Hylla reported Kjos's constitutional violations to the school board, in writing and in person. The school board ignored Hylla's report – functionally siding with Kjos in the matter. Within months, the school board nonrenewed Hylla and terminated her employment.

d. Kjos's treatment of Hylla took a 180-degree turn immediately after she refused his instruction to remove the concert song based on religious objections. Kjos's frosty treatment of Hylla was the culmination of months of tension over Hylla's refusal to let religious preference dictate school policy. In a matter of weeks, Kjos went from praising Hylla's performance to refusing to speak with her and recommending her nonrenewal.

e. Complaints about Hylla's "combativeness" with the church community – and Kjos's receptiveness to the complaints – began only after Hylla refused to bow to the churches' pressure (and Kjos's pressure) to remove the concert song.

f. Kjos recommended nonrenewal within weeks of Hylla's opposition to the song's removal, and within months of her written report to the Board.

165. As a direct result of the District's violation of the MWA, Hylla has suffered and will continue to suffer damages, including lost wages and benefits, lost earning capacity, emotional distress, mental anguish, embarrassment, and humiliation.

166. The District is liable to Hylla for "any and all damages recoverable at law, together with costs and disbursements, including reasonable attorney's fees," and for injunctive and other equitable relief. Minn. Stat. § 181.935(a).

**PRAYER FOR RELIEF**

Wherefore, Hylla respectfully requests that this Court:

A. Enter judgment in favor of Hylla and against Defendants;

B. Declare that Defendants' conduct violated the First and Fourteenth Amendments, the Minnesota Human Rights Act, and the Minnesota Whistleblower Act;

C. Award Hylla back pay, front pay, lost benefits, and lost earning capacity, in an amount to be determined by the jury;

D. Award Hylla compensatory damages, including damages for emotional distress and mental anguish, in an amount to be determined by the jury, and treble those damages as permitted by Minn. Stat. § 363A.33, subd. 8;

E. Award Hylla "any and all damages recoverable at law" under Minn. Stat. § 181.935(a);

F. Award Hylla punitive damages against Kjos under 42 U.S.C. § 1983, and against the District as permitted by Minn. Stat. § 363A.33, subd. 8;

G. Order the District to pay a civil penalty to the State of Minnesota under Minn. Stat. § 363A.33, subd. 8;

H. Award injunctive, declaratory, or other equitable relief, including reinstatement or front pay in lieu of reinstatement, and relief to ensure that the District ceases unlawful conduct similar to that alleged in this Complaint, under Minn. Stat. § 363A.33, subd. 9, and Minn. Stat. § 181.935(a);

I. Award Hylla her costs, disbursements, and reasonable attorney fees under 42 U.S.C. §§ 1988(b) Minn. Stat. § 363A.33, subd. 7, and Minn. Stat. § 181.935(a);

J. Award pre- and post-judgment interest as allowed by law; and

K. Award any and all additional relief supportable in law or equity.

Hylla demands a jury trial on all claims.

Dated: November 23, 2026

**MADIA LAW LLC**

/s/ Zane Umsted
J. Ashwin Madia, MN No. 321187
Zane Umsted, MN No. 398761
3075 IDS Center
80 S. 8th St.
Minneapolis, Minnesota 55402
Tel: 612.349.2729
Fax: 612.235.3357
jamadia@madialaw.com
zaumsted@madialaw.com

*Attorneys for Plaintiff Margaux Hylla*